J-A27041-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| VICTORIA LIVINGSTONE | |
| Appellant | No. 1829 WDA 2014 |

Appeal from the Judgment of Sentence October 20, 2014
In the Court of Common Pleas of Erie County
Criminal Division at No: CP-25-CR-0002750-2013

BEFORE:  BOWES, OLSON, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                **FILED DECEMBER 21, 2015**

Appellant, Victoria Livingstone, appeals from the judgment of sentence of the Court of Common Pleas of Erie County entered October 20, 2014. Appellant argues the trial court erred in denying her motion to suppress evidence.  For the reasons stated below, we affirm.

The trial court summarized the relevant background as follows:

[Appellant] is currently charged with one count each of driving under the influence of alcohol, general impairment – incapable of safe driving, second offense; driving under the influence, highest rate of alcohol, [Blood Alcohol Content] 0.16% or greater, second offense; and, careless driving.

On June 14, 2013, at approximately 9:30 p.m., Pennsylvania State Police Trooper Jeremy Frantz observed [Appellant]'s vehicle on the side of the road in the northbound lane of Interstate 79.[FN1]  [Trooper] Frantz pulled his cruiser directly beside [Appellant]'s vehicle to see if she needed assistance. [Appellant]'s vehicle was running as she attempted to put an address into her GPS.  When [Trooper] Frantz attempted to engage [Appellant], she gave him a "100 mile stare".  Frantz

asked if she was okay, and she replied, "yes". [Appellant] told him she was headed to New York for a race. Frantz observed that she either had a southern drawl or slurred speech and glassy eyes.

Trooper Frantz then moved his cruiser to the front of [Appellant]'s vehicle, exited, and further engaged [Appellant].[FN2] Frantz asked her if she had been drinking. She denied it. (She stated that she was looking forward to drinking once she arrived at her destination.) Frantz requested identification and [Appellant] complied. Appellant slurred her speech, cried continually, and she appeared confused. She continued to repeat herself and was unable to follow directions.

Based upon his observations, [] Frantz performed a horizontal gaze nystagmus ("HGN") test and [Appellant] tested positive. (During the HGN, [Appellant] had difficulty following directions.) [Appellant] was placed under arrest.

> [FN1] [Appellant]'s hazard lights were off.

> [FN2] Another trooper pulled behind [Appellant]'s vehicle.

Trial Court Opinion and Order, 6/18/14, at 1-2 (citations to the Crimes Code omitted).

After the trial court denied her motion to suppress evidence, the trial court, sitting as fact-finder, found Appellant guilty of all charges. Appellant was sentenced to twenty-four months intermediate punishment (with the first ninety days to be served on electronic monitoring) followed by probation, as well as fines as costs. This appeal followed.

Appellant raises one issue for our review:

Did the lower court error [sic] in holding that the interaction between Trooper Frantz and Appellant was a mere encounter where Appellant was voluntarily pulled over to the side of the road, at 9:30 PM, Appellant's hazard lights were not activated, there were no observable indications of distress to either the

driver or the vehicle, there was no report of a vehicle in need of assistance, there was no observable violation of the Pennsylvania Vehicle Code, and where trooper [sic] Frantz approached the vehicle from a distance of approximately 100 yards with his emergency lights activated, pulled beside Appellant, and immediately began questioning Appellant about her presence on the scene.

Appellant's Brief at 7.

We review an order denying a motion to suppress as follows:

In addressing a challenge to a trial court's denial of a suppression motion, we are limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the Commonwealth prevailed in the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as [] remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Scarborough*, 89 A.3d 679, 683 (Pa. Super. 2014) (quotation omitted).

Regarding the specific issue before us, *i.e.*, whether the initial interaction between the officer and Appellant was a mere encounter or an investigative detention, we apply the following standard:

To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved. To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a

- 3 -

> reasonable person innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes.

*Commonwealth v. Collins*, 950 A.2d 1041, 1046-47 (Pa. Super. 2008) (citation omitted).

The thrust of Appellant's argument is that the activation of patrol emergency lights instantly subjected Appellant to an investigative detention. This very same argument has been raised, unsuccessfully, numerous times. On several occasions, this Court has stated "triggering emergency lights or initiating interaction with a driver does not necessarily shift the interaction between an officer and a driver from a mere encounter to an investigatory detention." *Commonwealth v. Kendall*, 976 A.2d 503, 505 (Pa. Super. 2009) (citing, *inter alia*, *Commonwealth v. Conte*, 931 A.2d 690 (Pa. Super. 2007), and *Commonwealth v. Johonoson*, 844 A.2d 556 (Pa. Super. 2004)).[1]

_____

[1] In *Kendall*, driver was driving slowly and then pulled his car off to the side of the road where there were no driveways, commercial business, or homes. Trooper pulled his patrol behind driver's vehicle, activated the emergency lights, and approached driver. Trooper asked driver why he suddenly pulled over. While interacting with driver, trooper noted signs of intoxication. Driver filed a motion to suppress, arguing the stop (an investigative detention) was illegal because it was not supported by reasonable suspicion. We disagreed, finding the initial interaction did not require reasonable suspicion because it amounted to a mere encounter. In *Conte*, police officer, after receiving a radio dispatch of a possible disabled vehicle, drove to the scene, pulled behind driver's vehicle and activated his vehicle's emergency lights. Officer then approached driver, who had already exited the vehicle, and asked him if he needed help. Ddriver responded he had a flat tire. While interacting with driver, officer noted signs of intoxication. *(Footnote Continued Next Page)*

- 4 -

Whether there is a seizure depends on the totality of the circumstances. In ***Johonoson***, we noted:

> Critical to our determination is the fact that [a]ppellant pulled off the road voluntarily and came to a full stop on the side of the road without any prompting from Trooper Perloff. Trooper Perloff then parked behind [a]ppellant's vehicle, activated his overhead lights, and approached [a]ppellant to see if he could be of assistance. Trooper Perloff did not stop [a]ppellant's vehicle.
>
> Appellant relies almost exclusively on Trooper Perloff's flashing lights as a signal that he was "not free to leave," thus making the interaction an investigative detention. We recognize that flashing overhead lights, **when used to pull a vehicle over**, are a strong signal that a police officer is stopping a vehicle and that the driver is not free to terminate this encounter. The same is not necessarily true under the factual circumstances presented here. It is one traditional function of State Troopers, and indeed all police officers patrolling our highways, to help motorists who are stranded or who may otherwise need assistance. Such assistance is to be expected, and is generally considered welcome.
>
> Often, and particularly at night, there is simply no way to render this aid safely without first activating the police cruiser's overhead lights. This act serves several functions, including avoiding a collision on the highway, and potentially calling

*(Footnote Continued)* ————————————

Driver filed a motion to suppress, arguing driver was instantly subjected to an investigative detention—and not a mere encounter—when officer pulled his patrol car behind his vehicle, activated the overhead lights, and interacted with driver. We disagreed, holding that the initial interaction between officer and driver was a mere encounter, not an investigative detention. In ***Johonoson***, trooper observed a slow-moving vehicle traveling with its flashers activated on rural a road at approximately 3:00 a.m. Without signal, driver pulled his vehicle off to the side of road, at which point trooper followed behind. Trooper activated emergency lights, exited his car, and approached driver. Driver filed a motion to suppress, arguing that officer's use of emergency lights made him subject to an investigative detention. We disagreed, holding that the activation of emergency lights did not turn the interaction into an investigative detention.

additional aid to the scene. Moreover, by activating the overhead lights, the officer signals to the motorist that it is actually a police officer (rather than a potentially dangerous stranger) who is approaching.

*Johonoson*, 844 A.2d at 562 (footnote omitted) (emphasis in original).

Here, the trial court found that "[Trooper] Frantz pulled his cruiser directly beside [Appellant]'s vehicle to see if she needed assistance[,]" and that the interaction "was a mere encounter." Trial Court Opinion and Order, at 1, 4. Upon review, we conclude the record supports the trial court's findings and conclusions. Accordingly, we hold the trial court did not err in finding the initial stop was a mere encounter, which did not need to be supported by reasonable suspicion of criminal activity.

Appellant, however, argues the instant case is similar to *Commonwealth v. Fuller*, 940 A.2d 476 (Pa. Super. 2007), and *Commonwealth v. Hill*, 874 A.2d 1214 (Pa. Super. 2005)[2] because, as in

_____

[2] In *Fuller*, driver voluntarily pulled his vehicle off onto the berm of the road after noticing a patrol car following closely behind. Troopers pulled over after driver, activated their emergency lights, and approached the driver. Shortly after talking with the driver, troopers noticed signs of intoxication. Driver moved to suppress the evidence for lack of reasonable suspicion, but the trial court denied the motion, concluding that driver's interaction with troopers was a mere encounter that needed no reasonable suspicion. We disagreed, finding that the encounter between troopers and driver was in fact an investigatory detention that required reasonable suspicion. We reasoned that driver was not driving abnormally slowly or with his flashers activated. Further, we noted that driver did not engage in any conduct that would suggest to troopers that he was in need of assistance. In *Hill*, police officers on patrol observed a truck driving slowly. Officers were closely following the truck, when driver suddenly slowed and pulled off to the side of

*(Footnote Continued Next Page)*

*Fuller* and *Hill*, Appellant did not do anything that would lead the trooper to believe she needed assistance. We disagree.

The factual circumstances in *Fuller* and *Hill* are different from the instant scenario. In *Fuller* and *Hill*, the officers saw the motorists driving on the road before deciding to engage the motorists. Prior to engaging them, the officers did not observe anything that would suggest the motorists needed assistance. Here, however, Appellant's vehicle was parked on an interstate at night, which is unusual. While Appellant did not need assistance—and she might have done nothing to suggest she needed assistance, given the time and location where Appellant decided to park, it is not only reasonable, but also expected, that a policer officer would stop to conduct a safety check. *See*, *Kendall*, 976 A.2d at 508. Again, the analysis is based on the totality of the circumstances, and not only those that are most convenient.

---

*(Footnote Continued)* ────────────────

the road. Officers followed driver to the side of the road, activated the emergency lights, and approached the vehicle. One officer asked driver why he pulled over, to which driver responded that he noticed the patrol car following behind him. At that point, officer noticed signs of intoxication. Driver moved to suppress the evidence of intoxication, arguing officers lacked reasonable suspicion to conduct a stop. Specifically, he argued officer did not observe any violation of the Vehicle Code, nor did he give officer any indication he needed assistance. The trial court agreed with driver. We affirmed.

It should also be noted that absence of outward signs of a vehicle being in distress does not bar an officer from conducting a safety check. In *Collins*, we noted:

> The record indicates for example, that Trooper Walton parked twenty feet away from the rear of the vehicle. . . . The vehicle in question was not obstructing traffic or in violation of any traffic regulations. Although people parked at this location regularly, they did not do so as frequently after dark. Thus, Trooper Walton was concerned enough to check on the condition of the vehicle and safety of its occupants. Moreover, Trooper Walton testified that no outward sign of distress emanated from the vehicle, and he did not observe anything that would lead him to believe that illegal activity was occurring. Further, Trooper Walton explained on cross-examination that the occupants were not scrambling around as if they were trying to get away because a state trooper was approaching them. Instead, Trooper Walton approached the vehicle requesting information, asked if "everyone was ok" and then [a]ppellee blurted out that they were smoking marijuana. Trooper Walton at that point smelled burnt marijuana and observed the bong in the vehicle.

*Collins*, 950 A.2d at 1047 (footnote and citations to record omitted). Ultimately, in *Collins*, considering the circumstances of the case, we reversed the trial court's order granting the driver's motion to suppress, finding that the interaction between the trooper and the driver "typif[ied] a mere encounter . . ., not an investigative detention." *Id.*

Similarly, here, while Trooper Frantz did not observe any outward sign of distress emanating from Appellant's vehicle, he did observe circumstances suggesting assistance might be needed. Drivers do not commonly stop their cars on an interstate at night, and doing so is generally associated with a motorist having some sort of problem. Under the circumstances, therefore,

an officer checking on the motorist or the vehicle is not only likely, but also expected. What matters is whether, under the circumstances, the driver had reason to believe that the officer was simply carrying out his duty to render aid. Here, the trial court found the encounter between Appellant and Trooper Frantz was not an investigative detention, but rather an officer fulfilling his duty to see if a motorist needed assistance. The record supports this finding and conclusion. Accordingly, Appellant's claim fails.

Finally, Appellant fails to reconcile **Fuller** and **Hill** with other cases, such as **Kendall**, where this Court did not find the interaction to be an investigatory stop. In **Kendall,** we noted:

> It is true that there are cases where the trial court found that the stop was not just a mere encounter to render assistance, and the officer needed reasonable suspicion of criminal activity to detain a vehicle. In those cases, it was found that the driver would not reasonably believe he or she was free to leave or terminate the encounter with the officer. The activation of the officer's emergency lights when the officer is approaching the driver's vehicle may be a factor in what a reasonable driver would believe. Therefore, there would be record support for a trial court finding that the interaction between the officer and the driver amounts to an investigatory detention which requires reasonable suspicion.
>
> These are fact-sensitive situations and in general we must defer to the trial court determination. The cases that hold there *was* an investigative detention are distinguishable from this case, particularly because the trial court did not agree that the stop was to render assistance. [This Court then discussed **Hill** and **Fuller.**]
>
> . . . .
>
> While we have held that the applicable standard in determining whether an interaction rises to the level of an investigative

detention hinges on whether "a reasonable person believe[s] he was not free to go and was subject to the officer's orders," this should not be the only standard in situations like the one at hand. *Cf. Fuller*, 940 A.2d at 479. It has been suggested in the case law that this determination might turn on whether the driver had reason to believe that the officer is simply carrying out his duty to render aid. The ultimate decision is one the suppression judge must make after hearing all of the testimony and determining the credibility of the witnesses. Whether the *officer* believes the driver is free to leave is not the determining factor, and neither is the use of hazard lights before pulling over.

. . . .

In cases where a driver pulls over for an unknown reason, the officer must not be restrained from investigating the situation to assess whether help is needed. If the investigation occurs at night, it is reasonable for an officer to activate overhead lights to ensure his or her own safety as well as the safety of the driver, and to notify passing vehicles of their presence. A driver's unusual behavior is enough of a reason for an officer to stop, assess the situation, and determine whether the driver is in need of assistance.

Certainly an officer would realize that there might be a variety of reasons for unusual behavior by a driver which could include driving under the influence of drugs or alcohol. However, merely because the officer considers drunk driving as one alternative does not mean he is precluded from trying to aid a citizen if he also thinks the driver might be in distress. This decision must in the first instance be made by the trial judge and should not be upset unless the record does not support the trial judge's findings.

*Kendall*, 976 A.2d at 507-09 (emphasis in original).

Here, as in *Kendall*, the suppression court, considering the totality of circumstances, concluded the trooper approached the vehicle to conduct a safety check. Here, as in *Kendall*, the record supports this finding.

- 10 -

Accordingly, the trial court did not err in denying Appellant's motion to suppress evidence.[3]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/21/2015

---

[3] At oral argument, the parties mentioned **Commonwealth v. Barnes**, 96 A.3d 1084 (Pa. Super. 2014), (unpublished memorandum), *aff'd*, 121 A.3d 956 (Pa. 2015). Reliance on **Barnes** is misplaced. **Barnes** is an unpublished memorandum. As such, under our Internal Operating Procedures (I.O.P.), we cannot rely upon or cite it. Superior Court I.O.P. 65.37. Additionally, our Supreme Court affirmed **Barnes** in a *per curiam* order. It is well-established that *per curiam* orders do not carry precedential force. **See**, **e.g.**, **Commonwealth v. Thompson**, 985 A.2d 928, 937-38 (Pa. 2009). As such, we did not consider **Barnes** in deciding the instant matter.